**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| THE JONES COMPANY HOMES, LLC,[1] ) <br> ) <br> ) <br>   Plaintiff, ) <br> ) <br>  vs. ) <br> ) <br> LABORERS' INTERNATIONAL UNION ) <br> OF NORTH AMERICA, ) <br> ) <br>   Defendant. ) | Case No. 4:09CV1965MLM |

## MEMORANDUM OPINION

Before the court is the Motion for Summary Judgment filed by Defendant Laborers' International Union of North America ("LIUNA"). Doc. 101. Plaintiff the Jones Company Homes, LLC, ("Plaintiff") filed a Response. Doc. 103. LIUNA filed a Reply. Doc. 108. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 13.

### STANDARD FOR SUMMARY JUDGMENT

The court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts

---

[1] Plaintiff has changed its name to Pulte Homes of St. Louis, LLC. Facts relevant to when Plaintiff changed its name are disputed.

that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota, Minn. & E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248.

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Id. at 255; Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Id. at 252. With these principles in mind, the court turns to an analysis of LIUNA's Motion.

## BACKGROUND and UNDISPUTED FACTS[2]

In its First Amended Complaint, Doc. 3, Plaintiff alleges that its claims involve alleged

---

[2] The facts are undisputed unless otherwise stated.

unlawful secondary activity in violation of § 8(b)(4) of the National Labor Relations Act ("NLRA"), codified as 29 U.S.C. § 158(b)(4), and § 187 of the Labor-Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 187; that its claims also involve tortious interference with business expectancy and unlawful conversion; that, on October 19, 2009, as part of its ongoing campaign to unionize certain contractors and subsidiaries with whom Pulte Homes, Inc. ("PHI") does business, and to force those subsidiaries and contractors to exclusively use union subcontractors, LIUNA engaged in a concerted attack against Plaintiff and its employees; and that these acts included assault, battery, theft, destruction of properly, and other unlawful activities.

Plaintiff further alleges that PHI, the largest new home builder in the United States, operates in multiple locations throughout the United States; that Plaintiff is a builder of new homes in the St. Louis area and is a subsidiary of Centex, which became a wholly-owned subsidiary of PHI after Centex merged with PHI in August 2009; that PHI does not directly engage in home construction as construction activity is performed by contractors, including Pulte Building Systems, LLC, ("PBS"), an independent subsidiary of PHI; and that many of PHI's contractors and subcontractors are not unionized.

Additionally, Plaintiff alleges that, for at least two years, LIUNA has engaged in a campaign aimed at organizing employees of PHI's contractors and employees of PBS; that LIUNA's leadership, in Washington, D.C., orchestrated, authorized, and instructed LIUNA members to engage in the conduct subsequently described at the DoubleTree Hotel (the "DoubleTree"), in Chesterfield, Missouri, as part of its campaign; that, on October 19, 2009, approximately fifty of Plaintiff's employees attended a private meeting conducted by Richard Dugas, the Chief Executive Officer of PHI, in a conference room on the premises of the DoubleTree, in Chesterfield, Missouri; that the

3

purpose of the meeting was for Mr. Dugas to meet Plaintiff's employees and discuss recent developments affecting the companies; that, minutes after the meeting began, while Mr. Dugas was speaking to the attendees, approximately one hundred individuals wearing orange-colored clothing with LIUNA's label, "LIUNA," along with an individual wearing a "rat" costume, entered the room; that these individuals loudly chanted "shame on you," in unison; that multiple individuals held signs referring to alleged low hourly wages paid by PHI and accused PHI of selling poorly constructed houses; that none of the LIUNA members who entered the room made reference to any dispute with Plaintiff, nor did any of their signs; that LIUNA members who entered the room at the DoubleTree surrounded various attendees and, among other things, intimidated and threatened them; that the disruption caused Plaintiff to adjourn the meeting to a different location; and that the LIUNA members physically attacked one of Plaintiff's employees as he was leaving the room and attacked another in the parking lot.

Plaintiff alleges that LIUNA's primary dispute is with PBS and PHI or PBS's contractors; that Plaintiff is a neutral employer for purposes of § 8(b)(4); that LIUNA's conduct at the DoubleTree, as described above, was for an unlawful object under § 8(b)(4) of the NLRA, including, but not limited to, pressuring Plaintiff, a neutral employer, to pressure PHI and/or PBS to cease doing business with contractors, including PBS, who are not signatories to a LIUNA contract. In Count I, Plaintiff alleges that LIUNA's conduct constitutes an illegal secondary boycott in violation of § 8(b)(4) of the NLRA and § 393 of the LMRA. Also, based on the conduct described above, Plaintiff alleges as follows: Count II, Tortious Interference with Business Relationships; Count III, Conversion; and Count IV, Trespass.

While numerous factual allegations made by both parties are disputed, the court will set forth

relevant facts which are not disputed. PHI is a parent corporation for numerous subsidiaries. PHI does not directly construct homes. PBS is a subsidiary of PHI, but it is disputed whether PBS is "independent." Pl. Facts, ¶ 2. The PHI "Start-Up Guide" states that on April 8, 2000, "Pulte Homes and Centex Corp. announced that their respective boards of directors unanimously approved a definitive merger agreement." Def. Ex. 26 at 8. Plaintiff states that it does not have a board of directors. Pl. Resp. Def. Facts, ¶ 63. Jones Company Building Services ("JCBS") was a subsidiary of Jones Homes. Some JCBS employees were represented by members of LIUNA's local. Pl. Facts, ¶ 3. PHI and LIUNA have a labor dispute, although the parties do not agree what the basis of that dispute is. Steven Cook, Senior Vice President, General Counsel, and Secretary of PHI, testified that on August 18, 2009, "all members of the Centex Board of Directors resigned and were replaced by Mr. Richard Dugas, Roger Cregg, and Mr. Cook pursuant to the terms of the merger agreement"; that, therefore, the board of directors of Centex were replaced by three management personnel of PHI; and that, following the merger, Mr. Cregg had dual roles as the executive vice president of Centex and a senior officer of PHI. Def. Ex. 2 at 10-11. Mr. Cook also testified that Michael VanPamel "ran the St. Louis operations for Centex." Def. Ex. 2 at 20. Plaintiff states that Mr. VanPamel had been President of Jones Homes and Executive VP of JCBS. Pl. Resp. Def. Facts, ¶ 63. A document titled "Confidential Terms Regarding Employment Continuation," dated June 29, 2009, addressed to Mr. VanPamel states that he was "currently employed by Centex," and that, after the merger of Centex and "Pulte Homes," he would be employed as "Division President for Pulte Homes." Def. Ex. 28. In regard to Mr. VanPamel's signing this document, he testified that, "[a]lthough I looked at this [as] employment with the company, I took it to be the Jones Company in St. Louis where I was already working." Pl. Ex. 4 at 19. In any case, as set forth above, Plaintiff

5

acknowledges in its Amended Complaint that it is a subsidiary of Centex, which, in turn, is a wholly-owned subsidiary of PHI.

On September 3, 2009, PHI's General Counsel Steven Cook called LIUNA's Organizing Director. The purpose of the phone call is disputed; LIUNA contends the purpose of the call was to complain that, contrary to agreement between PHI and LIUNA, LIUNA had taken adverse action against PHI prior to an anticipated meeting; Plaintiff contends that, when making this call, Mr. Cook referenced an agreement regarding LIUNA's not harassing PHI's subsidiaries. Def. Facts, ¶¶ 1-2. The next day, at least one employee of PBS was terminated. One week later, PHI filed a lawsuit in Michigan against LIUNA. The purpose of the Michigan lawsuit is disputed. Def. Facts, ¶ 3. On October 12, 2009, PHI filed an Amended Complaint in Michigan against LIUNA. The Amended Complaint alleges, among other things, a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq.; that LIUNA engaged in improper activities that "significantly interfered with Pulte's business operations and its relationships with the general public, customers, potential customers, employees, and vendors"; and that PHI was seeking a temporary restraining order and preliminary injunction, among other relief. Def. Ex. 11.

On October 19, 2009, a meeting was held at the DoubleTree. While purpose of the meeting and who employed the persons attending the meeting is disputed, it is undisputed that persons in the audience were wearing "Pulte baseball jerseys emblazoned with the logos of PHI (with no mention of Jones)." Def. Facts, ¶ 11.[3] It is undisputed that Mr. Dugas spoke at the meeting; that

---

[3] Plaintiff did not respond to this fact and, therefore, it is admitted. See Doc. 103-1 at 14.

6

approximately 100 unidentified individuals, all wearing LIUNA tee shirts, entered the room[4]; that the persons entering the room "menacingly circled the seated employees" and shouted obscenities; that a "Pujols jersey" bought for the purpose of the meeting was missing[5]; and that, after the uninvited persons entered the DoubleTree meeting room, the meeting was adjourned. The Pujols jersey and the DoubleTree room were obtained with a credit card that said "Centex" and the expenses were charged to Plaintiff. Pl. Resp. Def. Facts, ¶ 38. Plaintiff's employee, Margherita, testified that as she attempted to return to her car, a large group of male individuals wearing LIUNA gear surrounded her and made obscene statements to her. She also testified that she could not identify these persons. Pl. Facts, ¶ 50; Def. Resp. Pl. Facts, ¶ 50.

Plaintiff's employees were instructed to certify, by September 4, 2009, that they had received and understood PHI's Business Practices and Employee Handbooks. Def. Exs. 13, 14. In Answers to Interrogatories, Plaintiff listed the persons present in the room at the DoubleTree on October 19, 2009, and indicated that each one of them signed the Business Practices and Employee Handbooks. Def. Ex. 12, Inter. 8-9.[6] Steven Cook, PHI's General Counsel, testified that the Business Practices and Employee Handbooks apply to every entity under PHI with the exception of PBS, which had "different employment policies that may have been in a separate handbook." Def. Ex. 2 at 119. Mr. Dugas testified that he did not know "if everyone in the audience [on October 19, 2009] was

---

[4] Plaintiff contends that the individuals were wearing LIUNA tee shirts. Defendant does not deny this aspect of the factual allegations of Plaintiff's Additional Facts, ¶ 47. Therefore, it is admitted that the individuals were wearing LIUNA tee shirts.

[5] Whether Centex or Plaintiff paid for the jersey is disputed. Def. Facts, ¶ 8.

[6] The court notes that Interrogatory No. 9 and Plaintiff's Response thereto did not state specifically when these documents were signed.

7

specifically Jones Company if there could have been Jones Building Systems employees there"; that he was "not familiar with exactly how they were all paid"; that he could not say who the persons attending the meeting "were legally and the entity employed them"; that "Jones Building Systems and Jones Company Homes, L.L.C., ... [are] two of the many subsidiaries that [PHI has] in the hundreds"; and that he did not know "exactly how they fall in the corporate family." Def. Ex 9 at 218-19. Mr. Dugas also stated, in an e-mail, dated Tuesday, October 20, 2009, and addressed, to among others, Jim Ellinghausen, Executive Vice President, Human Resources, for PHI, and Karen Knapp of PHI, and Cheryl Grise of Centex, that "[y]esterday the LIUNA union took their protests against Pulte to a new level when they literally stormed a private town hall meeting I was having in St. Louis at a local hotel with *our* 45+ employees." Def. Ex. 37 (emphasis added).

## UNLAWFUL SECONDARY ACTIVITY

As stated above, Plaintiff alleges that LIUNA engaged in unlawful secondary activity under § 8(b)(4) of the NLRA. In support of the pending Motion for Summary Judgment, LIUNA argues, among other things, that summary judgment should be granted in its favor because Plaintiff cannot establish the intent requisite to prove a violation of § 8(b)(4).

Section 8(b)(4) provides, in relevant part:[7]

(b) Unfair labor practices by labor organization

It shall be an unfair labor practice for a labor organization or its agents–

(4) (i) to engage in, or to induce or encourage any individual employed by any person

---

[7] Plaintiff does not limit its allegations in the Amended Complaint to any particular subsection of § 8(b)(4), although it states that its allegations include LIUNA's "pressuring Jones, a neutral employer, to pressure Pulte and/or PBS, that are not signatory to a LIUNA contract or have not agreed to enter into such an agreement." Doc. 3, ¶ 59. In its Response to the Motion for Summary Judgment, Plaintiff addresses only § 8(b)(4)(ii)(B), referenced as § 8(b)(4)(B).

> engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is–
>
> ...
>
> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

By enacting § 8(b)(4)(B), "Congress sought to shield neutrals from labor disputes that were not their own, on the basis that, inter alia, neutrals were often powerless to comply with the union's demands." Serv. Emps. Int'l, Union Loc. 525 (Gen. Maint. Serv. Co.), 329 N.L.R.B. 638, 639 (1999) (citing Carpet Layers Local 419 v. NLRB, 467 F.2d 392 (D.C. Cir. 1972)). Section 8(b)(4) prohibits "only 'secondary' objectives" on the part of a labor organization. Nat'l Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 620 (1967). Unlawful secondary activity exists "only when a labor union *intends* 'to enmesh neutral employers in primary disputes.'" Ruzicka Elec. v. IBEW, 427 F.3d 511, 519 (8th Cir. 2005) (emphasis added) (quoting NLRB v. Constr. & Gen. Laborers' Union Loc. 1140, 577 F.2d 16, 18 (8th Cir. 1978)). Thus, primary activity by a union may be protected "'even though it may seriously affect neutral third parties'" where the requisite intent is absent. Id. (quoting NLRB v. Local 825, Int'l Union of Operating Eng'rs, 400 U.S. 297, 303 (1971)). On the other hand, § 8(b)(4) "reflects a concern with protecting labor organizations' right to exert legitimate pressure

9

aimed at the employer with whom there is a primary dispute." NLRB v. Loc. 825, Int'l Union of Operating Eng'rs, 400 U.S. 297, 303 (1971).

An employer is not a neutral for purposes of § 8(b)(4)(B) where it "is so closely identified with, and allied to, the primary that it has ceased being neutral to the dispute." Serv. Emps. Int'l, Union (Gen. Maint. Serv. Co.), 329 N.L.R.B. 638, 639 (1999). A lack of neutrality exists where "the targeted entity is an 'ally' of the primary employer." Id. at 639-40.[8]

Whether it is suggested that the primary and the alleged secondary are a single employer or an ally, among the factors to consider are: (1) common ownership; (2) common management; (3) centralized control of labor relations; and (4) interrelationship of operations. Pickens-Bond Constr. Co. v. United Bhd. of Carpenters and Joiners, 586 F.2d 1234, 1241 (8th Cir. 1978). See also Radio and Television Broad. Technicians, Loc. 1264 v. Broad. Serv. of Mobile, Inc., 380 U.S. 255, 256-57 (1965) ("The controlling criteria, set out and elaborated in Board decisions, are interrelation of operations, common management, centralized control of labor relations and common ownership."); Schubert v. Bethesda, 319 F. Supp. 2d 963, 966 (E.D. Mo. 2006).

---

[8] Where an entity is a "'single employer' with the primary, or performs the primary's struck work, it is deemed an 'ally' of the primary that has forfeited its neutrality for purposes of Section 8(b)(4)(B)." Service Employees, 329 NLRB at 640. Additionally, "where it is demonstrated that the targeted entity exercises substantial, actual, and active control over the working conditions of the primary's employees, that entity may be found to have relinquished its 8(b)(4)(B) protections." Id. (citing Elec. Workers IBEW 2208 (Simplex Wire), 285 N.L.R.B. 834, 838 (1987)).

LIUNA suggests that there is a third category, which it characterizes as a "single inquiry" test. Doc. 101 at 4. Cases LIUNA cites in this regard likewise reference treatment of a parent and a subsidiary as a single employer and address the same factors discussed above. See e.g., Royal Typewriter Co. v. N.L.R.B., 533 F.2d 1030 (8th Cir. 1976) (citing Broadcast Technicians, 380 U.S. at 256; Marine Welding & Repair Works, Inc. v. N.L.R.B., 439 F.2d 395, 397 (8th Cir. 1971)).

Common ownership does not preclude a corporate subsidiary or division's being protected under § 8(b)(4)(B). J.G. Roy & Sons Co. v. N.L.R.B., 251 F.2d 771(1st Cir. 1958); Elec. Workers Local 2208 , 285 NLRB at 838 (holding that common ownership is insufficient to establish that an employer is a primary and not a secondary); San Francisco Examiner, 185 N.L.R.B. 303, 304 (1970).[9] However, where the day-to-day operations, including labor relations policies, are subject to the parent corporation's actual control, a subsidiary or division has been found not to be neutral. Id. (citing Alexander Warehouse, 128 N.L.R.B. 916 (1960)).  Control must be "active or actual," "not merely potential," for a subsidiary to be unprotected under § 8(b)(4)(B). Newspaper Guild, Los Angeles, 185 N.L.R.B. 303, 304 (1970).

Once it is determined that the target of a union's actions is a secondary, it must be determined whether one of the union's objectives was to force the secondary, or neutral, from doing business with the primary. Local 825, 400 U.S. at 304.  An objective meets this requirement and is unlawful where the purpose of the union's activity is to force the secondary to put pressure on the primary to meet the union's demands. Id. at 304.  Thus, to violate § 8(b)(4)(B), conduct must be both secondary and for an unlawful purpose.

To establish a violation of § 8(b)(4), Plaintiff in the matter under consideration must establish

---

[9]     On the other hand, a parent can be neutral where the union has a dispute with a subsidiary. For example, in Electrical Workers Local 2208 (Simplex Wire), 285 N.L.R.B. 834, 836 (1987), the parent did not manufacture anything and served two principal functions for its subsidiaries, acting a "banker" and, "because of the combined size of all its subsidiaries," it negotiated benefit packages and then made them available to its subsidiaries. The parent did not hire employees of the subsidiaries, with the exception that it hired the president of each subsidiary. The subsidiary, at issue, had its own personnel department, maintained its own bookkeeping department, ledgers, payroll and bills, wrote its own checks, had its own sales staff, and administered its own labor agreements. Id. Under such circumstances, the NLRB found that the parent was neutral and that, therefore, picketing of the primary was unlawful secondary activity.

that LIUNA engaged in unlawful secondary activity aimed at a neutral employer. See Ruzicka, 427 F.3d at 519. As discussed above, to have engaged in unlawful secondary activity, a union must have had the requisite intent, which in this case would be that LIUNA, by engaging in the conduct at the DoubleTree, on October 19, 2009, intended to force Plaintiff, as a neutral employer, to cease doing business with the alleged primary, PBS and/or PHI, with whom LIUNA had a dispute. See Ruzicka, 427 F.3d at 519; Int'l Ladies' Garment Workers' Union v. Donnelly Garment Co., 119 F.2d 892 (8th Cir. 1941).

> In regard to the intent element of § 8(b)(4)(B), the D.C. Circuit has held:
>
> The term "object" as it is found in the statute, or the words "tactically calculated ... objectives" as the Supreme Court paraphrased it in National Woodwork Manufacturers, are generally taken as synonyms for "purpose." On that basis, it has been held in the secondary boycott cases that the union's "improper motive and intent" must be established; that the union's conduct must "reveal [ ] a *specific intent to involve neutrals* in labor disputes not their own"; and that a union violated section 8(b)(4)(ii)(B) when it "purposefully picketed and handbilled the entire [jobsite] in order to influence neutral individuals."

United Scenic Artists, Loc. 829, v. NLRB, 762 F.2d 1027, 1032-33 (D.C. Cir. 1985) (emphasis added).

Section 187 of the LMRA incorporates by reference § 8(b)(4) and provides that whoever is injured in his business by reason or any violation of § 8(b)(4) may bring a private cause of action in federal court.

It is undisputed in the matter under consideration that, prior to October 19, 2009, Plaintiff's employees had been instructed to sign the PHI's Business Practices and Employee Handbooks; that at least some employees had done so; and that at least some employees attending the meeting were

wearing jerseys identifying them with PHI. Further, even Mr. Dugas, the CEO of PHI, did not know who exactly employed the persons present at the meeting and he did not know how the employees fell into the PHI corporate family. Assuming, arguendo, that the persons who disrupted the meeting at the DoubleTree on October 19, 2009, were members and/or agents of LIUNA, the court finds that the undisputed facts establish that these persons could not have known, nor could they have determined, the employer of the persons attending the meeting. Additionally, the undisputed facts, including that Mr. Dugas, an executive with PHI, was speaking and that the persons were wearing jerseys identifying them with PHI, establish that it was reasonable for the persons entering the room to assume that the attendees were employed by PHI. Under such circumstances, the undisputed facts establish that the persons who disrupted the meeting could not have had the requisite intent to involve a neutral to establish a violation of § 8(b)(4)(B). The court, therefore, need not determine whether Plaintiff actually was a neutral and/or whether the employees attending the meeting were actually employees of a neutral employer. Further, the court need not determine whether the conduct of the persons interrupting the meeting affected a neutral employer because, as stated above, to be unlawful pursuant to § 8(b)(4)(B), conduct must be *both* secondary and have an unlawful purpose. See Operating Engineers, 400 U.S. at 304; Donnelly Garment, 119 F.2d 892. Because the undisputed facts establish that Plaintiff did not and/or could not have had the requisite intent, the court finds, as a matter of law, that LIUNA did not engage in unlawful secondary activity. As such, the court finds that summary judgment should be granted in favor of LIUNA in regard to Count I of Plaintiff's Amended Complaint. See Anderson, 477 U.S. at 248-49; Celotex, 477 U.S. at 322.

Plaintiff's remaining claims allege violations of State law. 28 U.S.C. § 1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction where it has dismissed all claims

over which it has original jurisdiction. The court declines to exercise supplemental jurisdiction over Plaintiff's State law claims as it has found that summary judgment should be granted on the only claim over which the court has original jurisdiction. See Franklin v. Zain, 152 F.3d 783, 785 (8th Cir. 1988).

## CONCLUSION

The court finds that Defendant's Motion for Summary Judgment should be granted as to Count I of the Amended Complaint and that Plaintiff's remaining State law claims should be dismissed.

Accordingly,

**IT IS HEREBY ORDERED** the Motion for Summary Judgment filed by Defendant is **GRANTED,** as to Count I of the Amended Complaint; Doc. 3

**IT IS FURTHER ORDERED** that Counts II-IV of the Amended Complaint are **DISMISSED**; Doc. 3

**IT IS FURTHER ORDERED** that a Judgment shall issue this same day incorporating this Memorandum Opinion.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
Dated this 3rd day of May, 2011. UNITED STATES MAGISTRATE JUDGE